AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
11/19/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ASI___ DEPTUTY

FILED
CLERK, U.S. DISTRICT COURT
11/19/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KL___ DEPUTY

United States of America

v.

EMILIANA ELENA PENA,

Defendant.

Case No.   2:24-mj-06961-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of November 17, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Andrew Lee, HSI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: November 19, 2024

Judge's signature

City and state: Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
Printed name and title

AUSA: Alexander H. Tran x0758

**AFFIDAVIT**

I, Andrew Lee, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Emiliana Elena PENA for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Controlled Substances.

2. This affidavit is also made in support of an application for a search warrant for digital devices (the "SUBJECT DEVICES"), in the custody of Homeland Security Investigations, in Los Angeles, California, as described in Attachment A: one dark colored iPhone, IMEI number unknown ("DEVICE 1"), and one black colored iPad, IMEI number unknown ("DEVICE 2"), detained from PENA's person during her arrest.

3. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance) 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law), and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since July 2019.  My duties involve conducting and participating in criminal investigations of individuals and businesses for possible criminal violations of Titles 8, 18, 19, and 21 of the United States Code.  I am currently assigned to the HSI Office of the Assistant Special Agent in Charge ("ASAC") Los Angeles International Airport ("LAX"), which is responsible for investigating contraband violations involving international mail and travel.  Through my training, I have learned of HSI's criminal investigative authority and investigative techniques.

6.   In November 2019, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  During this training program, I completed approximately 350 hours of instruction, including classes involving the study of constitutional law, search and seizure, surveillance, and a variety of other law enforcement related classes.  In February 2020, I graduated from

the Homeland Security Investigations Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, Georgia.  During this training, I completed approximately 350 hours of training in the following subject matter areas: immigration law, customs laws, money laundering, search and investigative techniques, human trafficking and human smuggling, contraband investigations, and other program areas for which HSI bears responsibility.

7. During the course of my employment with HSI, I have participated in multiple investigations that involve drug and weapons trafficking.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by individuals involved in drug trafficking and how they use digital devices to facilitate and conceal their crimes.

### III.  SUMMARY OF PROBABLE CAUSE

8. On November 17, 2024, at approximately 6:00 p.m., PENA arrived in Los Angeles Airport ("LAX") from San Jose Mineta International Airport ("SJC") with a carry-on duffel bag and attempted to fly from LAX to Sydney Airport in Australia ("SYD").  The two black suitcases were checked in at SJC through to SYD, and the two black suitcases arrived at LAX at the same time.  During a secondary border screening of PENA's luggage at LAX, United States Customs and Border Protection Officers ("CBPOs") scanned PENA's checked luggage and detected several rectangular shapes overlapping containing crystal like shapes.

CBPOs scanned the two black suitcases through an x-ray, which revealed anomalies within the bag.

9. Upon further inspection by CBPO R. Levia, the first black suitcase contained seven rectangular bricks wrapped in black plastic and four black and clear vacuum sealed packages that had white colored crystals visible through the clear area of the package. The other black suitcase contained three rectangular bricks that were wrapped in black plastic and six black and clear vacuum sealed packages that had white colored crystals visible through the clear area of the package. Upon further examination and field testing, the black rectangular bricks field tested positive for Cocaine Hydrochloride. The black and clear vacuum sealed packages that had white colored crystals field tested positive for methamphetamine. CBP subsequently seized approximately 20.56 kilograms (45.32 pounds) of suspected methamphetamine, and approximately 10.52 kilograms (23.19 pounds) of suspected cocaine.

10. During the CBP examination, PENA claimed ownership of the carry on duffel bag and two black suitcases.[1] CBPO Levia discovered the baggage receipts for PENA's two checked black suitcases for PENA's flight from SJC to LAX and from LAX to SYD. CBPOs confirmed that the bag tags on the checked luggage matched with the baggage receipts on PENA's person. The checked baggage receipts also contained the name "PENA/EMILIANAELENA" (i.e., PENA's last name and first and middle name combined). At the

---

[1] PENA later stated she was provided the checked luggage by an unknown individual.

time of her arrest, PENA had the SUBJECT DEVICES in her possession.

### IV. STATEMENT OF PROBABLE CAUSE

11. On November 17, 2024, PENA attempted to travel from SJC to LAX to SYD in Australia via Delta Airlines. The initial leg of her trip was on Delta Airlines flight DL3969 from SJC to LAX, which landed at LAX at approximately 6:00 p.m.

12. Based on my conversations with CBPOs, my personal participation in this investigation, my own observations, and my discussions with other federal and local law enforcement officers, I know the following:

    **A. PENA Possessed Suspected Narcotics in Her Checked Baggage**

13. CBP officers informed me that on November 17, 2024, PENA was scheduled to depart LAX on board Delta Airlines flight DL 41 to Sydney, Australia. PENA was selected for an outbound enforcement examination as part of CBP's international flight screening protocols, which are based in part on current narcotics smuggling trends from the United States to Australia. In addition, PENA was identified based upon travel patterns with a recently purchased ticket to Australia and a newly issued U.S. passport with no obvious ties to Australia. CBP received two black suitcases from Delta Airlines at approximately 7:34 p.m., bearing baggage tag numbers ending in 8006632395 and 8006632396.

14. During an initial inspection, CBPO officers discovered that the checked suitcases contained rectangular bricks and

vacuum sealed bags with an unknown white colored crystal substance within.

15. According to CBP, CBPOs proceeded to LAX terminal 3 gate 32A where Delta Airlines flight DL 41 was preparing to board at approximately 9:55 p.m. to intercept PENA. CBPO Levia encountered PENA. PENA stated she was visiting her mother and father in Australia for two weeks. PENA stated she had one carry on and checked two black suitcases. PENA provided her baggage tag receipts which bore the tag numbers 8006632395 and 8006632396 along with "PENA/EMILIANAELENA" listed on both bag tags.

16. According to CBP, PENA stated her two checked black suitcases contained clothes and shoes. PENA stated she purchased her ticket herself about a month ago. PENA was asked if she was taking anything or was given anything to take for anyone else to which PENA provided a customs declaration with no items declared for inspection (i.e., a negative customs declaration).

17. CBPOs presented the two black suitcases which bore the numbers 8006632395 and 8006632396 along with orange tags labeled "HEAVY" to PENA. Upon seeing the bags, PENA stated the bags were her checked bags. PENA stated she was charged $200 for the HEAVY bags. PENA provided CBPOs a second negative customs declaration while her two black suitcases were present before her. PENA stated she had not received anything from anyone, and that the bags were hers. PENA stated that she threw her baggage receipt away.

**B. CBP Seized Approximately 20.56 Kilograms of Suspected Methamphetamine and 10.52 Kilograms from PENA's Checked Luggage**

18. CBPOs escorted PENA to secondary border screening for further inspection. Upon arrival at the secondary border screening, CBP conducted its secondary screening process and opened PENA's bags. PENA's carry on duffel bag contained miscellaneous clothing.

19. The two black checked bags each contained a black Hefty bag which contained miscellaneous clothing, and a pillowcase where each pillowcase contained five black vacuum sealed packages. The first black checked bag's vacuum sealed bags contained seven rectangular bricks wrapped in black plastic and four black and clear vacuum sealed packages with white colored crystals visible through the clear area of the package. The other black checked bag contained vacuum sealed bags with three rectangular bricks that were wrapped in black plastic and six black and clear vacuum sealed packages that had white colored crystals visible through the clear area of the package.

20. Below are images of the two black checked bags with baggage tag numbers 8006632395 and 8006632396 matching the baggage tag receipts PENA provided. PENA's baggage tag receipts also contained the name "PENA/EMILIANAELENA" (_i.e._, PENA's last name and first and middle name combined).

 

21. Depicted below within one of the two black suitcases, are the Hefty bag, pillowcase, and the black vacuum sealed bags containing bricks and vacuum sealed packages:

 

8

22. At approximately 11:03 p.m., CBP tested the black brick shaped items, and the black and clear packages with white crystal items utilizing a Gemini Chemical Identification Analyzer. The black brick shaped items field tested positive for Cocaine Hydrochloride. The black and clear packages with white crystal items field tested positive for methamphetamine. Pictures of the black bricks and the black and clear packages with crystal items are below:

 

23. In total, CBP seized approximately 20.56 kilograms (45.32 pounds) of suspected methamphetamine, and approximately 10.52 kilograms (23.19 pounds) of suspected cocaine, including packaging.

C. **Law Enforcement Attempted to Interview PENA**

24. On November 17, 2024, at approximately 11:09 p.m., I received a call from CBP at LAX. CBP stated that they had conducted an inspection of PENA and field-tested suspected narcotics which tested positive for methamphetamine and cocaine.

9

25. After CBP seized the suspected methamphetamine and cocaine, I responded to LAX on November 18, 2024, at approximately 12:00 a.m. to examine the evidence. I interviewed PENA at approximately 1:08 a.m. HSI Special Agent S. Cvijanovic and I advised PENA of her Miranda rights, which she waived.

26. PENA stated that she was not under the influence of drugs or alcohol. PENA stated she did not know what was in the bags. PENA stated she got the bags before she came to LAX. PENA stated she took the bags from someone. PENA stated she had nothing to say.

27. PENA would not respond to questioning. When I informed PENA that she would be going to jail today, PENA stated she assumed that. PENA requested that she have an attorney present, and we subsequently terminated the interview at approximately 1:22 a.m.

28. After the interview, I detained PENA's passport, flight documents, and the SUBJECT DEVICES, which were on PENA's person at the time of her arrest.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

29. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

  e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30. As used herein, the term "digital device" includes the SUBJECT DEVICES.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

  a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

  b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

34. For all of the reasons described above, I submit that there is probable cause to believe that PENA has committed a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances). I further submit that there is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19 th day of
November 2024.

_____
HON. ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE